1    D8E0SARS                          Sentence

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------x

4    UNITED STATES OF AMERICA,

5              v.                          13 CR 214

6    SEYED AMIN GHORASHI
     SARVESTANI,
7
                   Defendant.
8
     ------------------------------x
9
                                         New York, N.Y.
10                                       August 14, 2013
                                         10:51 A.M.
11

12

13   Before:

14                  HON. PAUL G. GARDEPHE,

15                                       District Judge

16
                         APPEARANCES
17
     PREET BHARARA
18        United States Attorney for the
          Southern District of New York
19   RACHEL PETER KOVNER
     Assistant United States Attorney
20
     WILLIAM F. COFFIELD
21   WILLIAM SILVERMAN
     Attorneys for Defendant
22

23   Present:  Agent Brian Surek

24   Mamad Shirazi, Farsi Interpreter

25

1        (In open court; defendant present)

2        THE DEPUTY CLERK:  Call the case of United States v.

3  Sarvestani.

4        Government ready?

5        MS. KOVNER:  Yes, your Honor, good morning.  Rachel

6  Kovner, for the government.  And with me at counsel table is

7  Brian Surek of the FBI.

8        THE DEPUTY CLERK:  Defendant?

9        MR. COFFIELD:  Bill Coffield, with Bill Silverman, on

10  behalf of the defendant, Seyed Amin Ghorashi Sarvestani.

11        THE COURT:  All right.  This matter is on my calendar

12  for purposes of sentencing.

13        In preparation for sentencing, I have read the

14  presentence report dated August 7th, 2013.  And I have read the

15  defense submission dated July 31st, along with numerous letters

16  from Mr. Sarvestani's family, business associates, employees,

17  and friends.  And all of the other exhibits submitted by the

18  defense.

19        I have also read government's sentencing memorandum

20  dated August 7th.

21        Who will be speaking on behalf of the defendant, is it

22  Mr. Coffield?

23        MR. COFFIELD:  I will, your Honor.

24        THE COURT:  Mr Coffield, have you read the presentence

25  report and its recommendation and discussed it with Mr.

1  Sarvestani?

2          MR. COFFIELD:  Yes, we have, your Honor.

3          THE COURT:  And Mr. Sarvestani, have you read the

4  presentence report and discussed it with your attorney?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Mr. Coffield, do you have any objections

7  to the factual portions of the presentence report?

8          MR. COFFIELD:  No, none that are not already noted in

9  the report itself, your Honor.

10         THE COURT:  All right.

11         Does the government have any objections to the factual

12  portions of the presentence report?

13         MS. KOVNER:  No, your Honor.

14         THE COURT:  Then I hereby adopt the findings of fact

15  set forth in the presentence report.

16         Although I'm not required to impose sentence in

17  accordance with the Sentencing Guidelines, I am required to

18  consider the recommended range in imposing sentence.

19         Here, the probation department determined that Mr.

20  Sarvestani's base offense level is 26, two more levels were

21  added because the defendant was an organizer, leader, manager,

22  or supervisor of the criminal activity.  He received a

23  three-level reduction for acceptance of responsibility,

24  resulting in a final offense level of 25.

25         Mr. Sarvestani has no criminal record.  Therefore he

1    falls in criminal history category I, offense level 25.

2            Criminal history category I yields a recommended

3    sentencing range of 57 to 71 months imprisonment.  However,

4    because the crime to which the defendant pleaded guilty carries

5    a statutory maximum of five years, the applicable range here is

6    57 to 60 months imprisonment.

7            Mr. Coffield, any objections to the guidelines

8    calculation set forth in the presentence report?

9            MR. COFFIELD:  No, your Honor.

10           THE COURT:  Ms. Kovner, does the government have any

11   objections to the guidelines calculations set forth in the

12   presentence report?

13           MS. KOVNER:  No, your Honor.

14           THE COURT:  Based on my independent evaluation of the

15   sentencing guidelines, I accept the calculations set forth in

16   the presentence report.  Accordingly, I find that the offense

17   level is 25, the criminal history category is 1, and the

18   recommended sentencing range is 57 to 60 months imprisonment.

19           Before I ask counsel to address the sentencing issues

20   here, I want to raise a couple of issues that I want to be sure

21   you address.

22           First, I understand that the equipment at issue

23   includes equipment that was designed for use in positioning,

24   monitoring, and controlling satellites, and satellite antennae.

25   And defense asserts that this equipment may now be lawfully

exported to Iran as a result of a May 13th, 2013 change in regulation.  Citing the defense brief at 20 and 23.

The government says that it would be illegal, today, to export this equipment to Iran.  Citing the government brief at 9.

Having read the regulation, it appears to me that the government has the better of the argument.  I want both sides to address this issue in their comments.

The second issue concerns the amount of prohibited merchandise the defendant caused to be shipped to Iran.  The government says that the defendant's companies did "millions of dollars of business transactions in Iran, and that sales of U.S. made goods were a substantial part of that business."  Citing the government brief at 4, which in turn relies on the presentence report, paragraphs 15 to 16.

The defense states that the defendant derived only $54,000.  From the offense defense brief at 6.

I understand that the $54,000 was the defendant's profit on the transactions, but I want to know whether the defense disputes the gross value of the transactions that the government references.

Finally, the defendant has cited a great deal of law involving sentencing determinations in other cases involving violations of the export regulations.  And I invite the government to address the defendant's submission in this

1    regard, which is exhibit 10 to the defendant's sentencing

2    memorandum.

3          With that background, Mr. Coffield, I'll hear you as

4    to an appropriate sentence.

5          MR. COFFIELD:  Thank you, your Honor.  May it please

6    the Court.

7          Your Honor, I -- Mr. Silverman and I have, over the

8    course of time discussed, at least in our collective

9    experience, how unique this particular case is.  And there are

10   several factors that make it unique.

11         One, that the offense conduct is now legal.  I

12   understand that your Honor wants us to address that, and I

13   will.

14         The other unique aspect is the extraordinary family

15   circumstances that this case presents.  Also, Mr. Silverman and

16   I have been talking.  We have never seen the kind of outpouring

17   of support as we have in this case.  And it's not just a lot of

18   letters.  It is the substance of these letters.  I think it is

19   the substance of these letters that highlight the most unique

20   thing about this case.  And that's this man, here, that's Amin

21   Sarvestani.  He is what jumps out from these letters.

22         This is a man who treats every human being with

23   dignity and respect, who helps his fellow human being without

24   looking for recognition, and is really a citizen of the world,

25   and treats everybody, everybody, as his equal, and reaches out

1    to people in need.

2            The concern that he has had, and what has caused him

3    sleepless nights for 10-plus months that he has been

4    incarcerated, has been his wife and child.  That has been his

5    primary concern.  And we cannot understate the impact, of his

6    continued incarceration, on his wife and child.  And I think

7    the PSR appropriately addresses that point.

8            The government has acknowledged the defendant's

9    meetings with them, his efforts to assist them, his positive

10   conduct, and acceptance of responsibility.

11           Following the 3553 factors, your Honor, there are

12   several factors that, in and of themselves, warrant time

13   served.  But, taken collectively, I think they overwhelmingly

14   support time served as an appropriate sentence.

15           We have a man with an exemplary background, as has

16   been stated again and again in all of these letters.  We have

17   an offense conduct that is now legal.  And I believe, your

18   Honor, that there is no question the vast majority of the

19   products that are at issue here are now legal.  What the

20   government points to is the beacon receivers.  They also make a

21   reference, in the footnote that they dropped, to a tracking

22   controller.  There is no evidence that that tracking controller

23   is U.S. sourced, number one.  But, number two, a beacon

24   receiver is just that, it is a receiver.  And under Category IV

25   of the license, it is a receiver.  If it was not a receiver, it

1   would be characterized receiver/transmitter.  But it is a

2   receiver.  And, your Honor, I have learned a little bit more

3   about satellites than I ever thought I would.  But a beacon

4   receiver does just that.  It receives the beacon from the

5   satellite working in conjunction with a tracking controller.

6   The tracking controller simply moves the ground antenna that is

7   on the ground.  The tracking controller, working in conjunction

8   with the beacon receiver, moves the antenna so that it can

9   actually track satellites and get the beacon.  This is receiver

10  equipment.  This fits under Category IV.  It is still --

11  this -- this conduct, even with the beacon receivers, is, now,

12  lawful.

13          THE COURT:  Well, when you say Category IV, let's look

14  at the regulation which is attached as exhibit 5 to your

15  submission.

16          MR. COFFIELD:  If you look at the annex, your Honor,

17  that's at the very last page, and you look down in Section 4,

18  residential consumer satellite receive-only terminals.

19  Receiver equipment including, but not limited to, antennas,

20  receivers -- this is a beacon receiver.  It is a receiver.

21          More importantly, your Honor --

22          THE COURT:  Is this the type of thing that would be

23  used by consumers?

24          MR. COFFIELD:  Yes, your Honor, it is.  Your Honor

25  asks an appropriate question.  And that's one of the more

1   significant parts of this.

2           The customer here is a smaller version of Comcast or

3   Time Warner.  It is a company that's sole purpose is to provide

4   internet connectivity and communication to the general

5   population in Iran, something that Iran, the government of

6   Iran, seeks to jam.

7           And if you look in one of our other exhibits, your

8   Honor, we were able to obtain a memorandum from the government,

9   to banks, and to some other government controlled entities,

10  telling them to stop using satellite communication and to start

11  using hard wire communication.

12          We also have extraordinary family circumstances here,

13  your Honor.  And I believe that the government -- the

14  government talks about the affidavit.  And I think there may be

15  a misunderstanding, or some confusion in that the government

16  seems to take the position that Mr. Sarvestani's wife and child

17  can stay in Singapore until 2017, no matter what.  And that's

18  not the case.

19          And I believe Mr. Masnan's affidavit addresses that.

20  And the problem being that if Mr. Sarvestani is not back, and

21  does not get that company to the point where his audit that

22  will occur early next year shows activity on behalf of the

23  company, then there is a high likelihood that the ICA,

24  Immigration Controlling Authority, would actually revoke the

25  residency, which contract Singapore has no control over.

1          THE COURT:  Well, let me say, I can't -- you have

2    alluded now, several times, to what you have described as

3    "extraordinary family circumstances" related to the defendant's

4    immigration issues, both with respect to Canada and with

5    respect to Singapore.

6          And let me say that I don't view those circumstances

7    as extraordinary.  In fact, there is nothing novel about a

8    defendant who has pleaded guilty to a crime and is awaiting

9    sentencing, there is nothing novel about defendants facing,

10   defendants and their families facing what are often tragic

11   circumstances relating to their immigration status.  The most

12   typical scenario is deportation from the United States.

13         Now, this defendant is not a United States citizen, so

14   we're not talking about presence in the United States.  We're

15   talking about access to other countries.  But it is by no means

16   uncommon.  In fact, it actually is common that a criminal

17   conviction results in the deportation of, sometimes, people who

18   have spent decades in the United States.  It leads to family

19   separations in many instances.  In other instances it leads to

20   spouses and children being required to go to a country that

21   they have never actually been to.  So it's a frequent result of

22   a criminal conviction.  There is nothing novel or unusual about

23   it.

24         While I'm sympathetic to the circumstances of Mr.

25   Sarvestani's family, I can't find that there is anything novel

or unusual about that.  It is just not novel or unusual.  In fact, it is the opposite.

So, I wanted you to know that because you're placing a lot of reliance on that argument, and it's not one that I find persuasive.

MR. COFFIELD:  Well, your Honor, it I can follow up, with the Court's indulgence.

THE COURT:  Yes.

MR. COFFIELD:  It is a bit different here.  As your Honor has stated, there is no question that somebody who is in the United States would have to be deported and leave the United States.  And I understand that position.  Here, however, we have a wife and child who are in a country under a temporary residency program.  They are awaiting residency in Canada which is where they originally had decided that they were going to move, from Dubai.  But, once they were in Dubai, the problem here is that these people, if this happens, will be going back to Iran.  And that is a circumstance that I think makes it different, certainly, than the normal immigration deportation that you have here in the United States.

We have got two people who are going to be forced to go back to Iran, one who was a political prisoner in Iran, and a child who has only visited there for less than the number of times than you can count on your fingers.  So we have got a unique situation.  Because we have got two completely innocent

1    people that will be impacted by that, in another country where

2    the residency is dependent here, but they would be going to a

3    country where I don't think anyone would argue that it's gonna

4    be extremely difficult for them, especially in Mr. Sarvestani's

5    situation.

6            May I, your Honor?

7            THE COURT:  Yes.  Go right ahead.

8            MR. COFFIELD:  Your Honor asked us to address the

9    amounts.  And I will say that there is an allusion to millions

10   of dollars.  There were millions of dollars of trade that

11   happened with these companies, with these different companies.

12   That happened.  It is perfectly legal.  It is not illegal for

13   another citizen of another country to take other goods and sell

14   them to Iran.  That is --

15           THE COURT:  That's not the assertion that is made.

16           The assertion that is made is a substantial percentage

17   of the millions of dollars of commerce that you are talking

18   about was in US-made products.  That's the assertion that is

19   made in the government's brief.

20           MR. COFFIELD:  Your Honor, we have -- your Honor, we

21   have -- we have said, and I believe the government would

22   acknowledge, that it is several hundred thousand dollars over a

23   seven-year period.  That's what the amount was.

24           Your Honor, for purposes -- I don't know if your Honor

25   wants me to -- the government seemed to want some clarification

1  on his Canadian situation.  And I don't know if the Court wants

2  me to address that.  I can do it very quickly.

3          THE COURT:  What I understand from the papers is that

4  he has a limited amount of time to appear in Canada.

5          MR. COFFIELD:  Correct, Judge.

6          THE COURT:  In connection with a residency

7  application.  And it's a very limited amount of time.  It

8  expires, according to the defense, sometime over the next eight

9  or so days, by my calculation.

10          MR. COFFIELD:  Yes, your Honor.

11          THE COURT:  So that's my understanding of it.  I

12  believe the government's response has been, well, we don't know

13  whether he could re-apply.

14          MR. COFFIELD:  And I would, just for purpose of

15  clarification.  If his application is denied, he could

16  re-apply.  But as -- but to make clear, the application process

17  is about a five-year process.  And the most significant point

18  there being his wife and child cannot make application, they

19  can not present their passport absent him.  He is the primary

20  applicant, which means he must present the passport.  His wife

21  and child cannot do that.  They would not be able to go to

22  Canada, present their passports, and get their residency there.

23          Your Honor, I -- there -- I think we've addressed the

24  disparity in the sentencing.  And we have given the Court a

25  number of cases that, significantly, there is more egregious

1  conduct that has occurred here and the defendants were

2  sentenced to less than Mr. Sarvestani has actually served.

3        And one of the cases that I was looking at that I

4  would highlight for your Honor is the Guillard case, where

5  Judge Ross sentenced Mr. Guillard in the Eastern District of

6  New York for conduct that occurred over a seven-year period

7  where there were exports to Cuba and Iran.  And Mr. Guillard

8  had actually had an interview with the Department of Commerce

9  Export Enforcement about not exporting.  So he was fully aware.

10  He was a U.S. citizen.  It's a U.S. company.  He owned the

11  company.  The activity took place over a seven-year period.

12  Most of the arguments that were made were about the employees

13  who would suffer as a result of not being able to have their

14  business, general family considerations, the acceptance of

15  responsibility.  But that case also included allegations by the

16  government that the defendant had obstructed.  And the ultimate

17  sentence that was given there, and your Honor, the chart is a

18  little off, it says he was given a month.  He was actually

19  given a month of incarceration and 6 months home confinement.

20        Finally, your Honor -- and I -- and I sincerely mean

21  this.  And, again, Mr. Silverman and I, both, believe this

22  emphatically.  Society is better off with Mr. Sarvestani out,

23  than in.  The outpouring of support, the testimony to his

24  nature, to how he treats every human being with dignity and

25  respect, how he helps those in need of help, and the fact that

there are a lot of people that will suffer due to his continued

incarceration.  And we respectfully ask that the Court follow

the recommendation of the probation office and sentence Mr.

Sarvestani to time served.

I beg the Court's indulgence.

Your Honor, Mr. Silverman has appropriately noted that

I think the government concedes that the vast majority of these

parts are still legal.  If the Court wants further briefing on

this, further information about the select parts that have been

noted, we would be happy to provide that.

THE COURT:  All right, I'll hear from you, Ms. Kovner.

MS. KOVNER:  Your Honor, let me start with the issue

of the scope of the activities engaged in, or the illegal

export activities by the defendant's companies, and the issue

of the new regulation, or the general license as is related to

that.

Your Honor, I think the scope of the defendant's

business is best described in the PSR around paragraphs 15, 16,

and 17.  And, basically, they lay out that the defendant's

companies were involved in substantial exports of U.S. made

parts to Iran.  They were basically companies that procured

goods for Iranian companies.  And many of those parts came from

the United States.

They were -- and then the PSR talks about several

specific transactions that Mr. Ghorashi was directly involved

in communications about. And those were the transactions

involving the parts that are discussed, the particular

satellite-related parts that are discussed in the PSR.

Those parts we understand to be parts that are used

for controlling satellites. And I think that Mr. Coffield's

response is, well, maybe the tracking receivers didn't come

from the U.S., they were being bundled with the other parts and

then shipped on, but maybe the tracking receivers were from a

different source.

I think the fact that these goods are being, you know,

various goods used to control satellites were being bundled

together and then sent on to an Iranian company, indicates that

these parts were collectively parts that were designed for

controlling satellites. That is -- the fact that a U.S. made

satellite part is being bundled with a tracking receiver to

control a satellite, and then sent on to an Iranian company

gives a pretty good sense to what these parts were being used

for.

In addition, I think the PSR describes what the

particular satellite piece from the U.S. was used for. And,

again, it is not a residential part. It is a part that is used

to control satellites, but not a part that falls within the

category of residential consumer satellite receive-only

terminals.

Your Honor, the other point about this is it is just a

1    kind of after the fact fortuity that the regulations have

2    changed somewhat to allow the shipment of certain kinds of

3    technology to Iran, after Mr. Ghorashi's conduct.  In the

4    context of companies that were basically in the business of

5    providing goods to Iranian companies, some of the goods that

6    were provided turned out later to be legalized for export to

7    Iran.  But that was not something that was in Mr. Ghorashi's

8    head.  It was not something that was contemplated by these

9    businesses which were just profit-making entities to distribute

10   goods to Iran.

11         So, it may be relevant to the Court's consideration.

12   I don't think it is extremely relevant that, after the fact,

13   the U.S. has legalized some, but not all, shipments of

14   residential satellite reception technology to Iran.

15         With respect to value of the transactions in this

16   case, there was substantial discussion between the parties of

17   what an appropriate forfeiture amount was in this case.  Over

18   the course of those discussions, we presented defense counsel

19   with evidence of a large volume of transactions involving these

20   companies to Iran.  And there was sort of back-and-forth about

21   what the appropriate number was representing Mr. Ghorashi's

22   profits, his personal profits.

23         As your Honor knows, it is often difficult for us to

24   prove up a very specific dollar amount of what an individual

25   defendant got in this transaction.  And this is an amount we

1    accepted based on a back-and-forth with the defendant about

2    what his profit was, and what we would be able to prove up as

3    his profit.  But I think all of the parties are agreed this

4    doesn't represent the entire amount of money that these

5    companies -- I'm sorry, that the value of the goods that these

6    companies were shipping to Iran, which was quite significant.

7            The third, I think, issue your Honor raised is the

8    chart that the defendant had prepared showing below guidelines

9    sentences.  It's a little bit hard for me to respond to those

10    cases without knowing substantially more about what happened in

11    those cases.

12            As your Honor knows, sentencing is an individualized

13    determination.  Defense has certainly shown that, in some

14    cases, judges have found it appropriate to give some defendants

15    below guidelines sentences although, often, they are also quite

16    substantial sentences.  Without knowing more about what

17    individual facts motivated the judges in those cases, it is

18    hard for me to compare it to Mr. Sarvestani's case.  I think

19    the factors of greatest concern to the government here, your

20    Honor, are this is a defendant who was a leader in those

21    companies, who didn't need to be engaged in this at this time.

22    He was not under duress, wasn't doing this under some sort of

23    financial duress.  Was not doing this at the direction of

24    others.  So while it is hard for me to know all of the personal

25    circumstances of the defendants in these other cases, I think

1 | those are factors of concern here.  And they suggest that this
2 | is not a defendant at the very bottom of the IEEPA ladder.
3 | THE COURT:  All right.
4 | Mr. Coffield.
5 | MR. COFFIELD:  I beg the Court's indulgence.
6 | Your Honor, again, I would simply emphasize that I
7 | think there is a misunderstanding about what these parts are.
8 | These parts are receiver parts.  They're tracking
9 | controllers, controller for an antenna on the grounded, not the
10 | satellite.
11 | I think the most -- the most that the government does
12 | in its briefing is explains that you could take some of these
13 | parts, and if you put them together with a bunch of other
14 | things, you may be able to control a satellite.  That is not
15 | what is happening here.  These are being sold to a company that
16 | is using these things to receive satellite signals and then
17 | take that information and give it to people who are the general
18 | population of Iran.  Which is something the United States
19 | government has been supporting for years.  I think that is a
20 | significant point.
21 | The other discussion that we have, which was there was
22 | $54,000 attributed to Mr. Sarvestani.  There was no profit
23 | involved in that.  That company, in fact, was a losing company.
24 | As we point out, he sold his interest in this company before
25 | this ever occurred.

 1          And one other thing, your Honor -- and I didn't

 2     mention this earlier, I mention it now.  Hopefully, we have

 3     done an adequate job of expressing to the Court all of the

 4     activity Mr. Sarvestani was involved in.

 5          He was involved in a tremendous amount of commerce.

 6     At one company alone in 2012, he did $200 million in sales.

 7     This is this is a blip on the radar screen.  And the truth is,

 8     your Honor, had he been thinking about this, I don't think this

 9     would have ever happened.  There wasn't any conscious thought

10     about this.

11          THE COURT:  Mr. Sarvestani, is there anything you wish

12     to say before the Court imposes sentence?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Your Honor, I never thought, in my life, a

15     day would come that I shall be standing before a judge for

16     sentencing in a criminal matter.  I am extremely disappointed

17     in myself.  Not only because of the lapse in my judgment, but,

18     also, because I'm morally devastated at the thought of -- of my

19     actions.

20          I always thought I'm walking in the right path, and I

21     never will be lost.  But, here I am today, and I'm totally

22     lost, and I have jeopardized whatever I built in my life.

23          I lost my reputation, which was one of my most

24     valuable assets.

25          I am in danger of losing my business, which is the

1  result of my 25 years of hard work.

2          And, worst of all, I failed to protect my family,

3  which is the most precious asset in my life.

4          I placed them, and their future, in great danger.  And

5  with a simple word, the wrong decision, nearly destroyed my

6  whole life.

7          No words can express how guilty I feel, given my

8  family's current situation, that they may end up without a

9  home, or worse, a place to live.  This being a tremendous

10  burden I have placed upon them, one which I can never forgive

11  myself for.

12          Your Honor, I can assure you that if I possessed the

13  knowledge I have today prior to all of this occurring, or if I

14  had an opportunity to go back in time, I would do everything in

15  my power to prevent such a gross negligence on my part.

16          I stand before you today ashamed, and embarrassed, and

17  humbly requesting for forgiveness.  Not just for my family, but

18  from the Court for incurring the burden and costs of the

19  criminal case.

20          Thank you, your Honor, for giving me the opportunity

21  to express myself.

22          THE COURT:  In deciding upon an appropriate sentence,

23  I have considered all of the factors set forth in Title 18

24  United States Code Section 3553(a), including the nature and

25  circumstances of the Mr. Sarvestani's offense, his personal

history and characteristics, the need for the sentence imposed
to reflect the seriousness of the offense, to promote respect
for the law, to provide just punishment, and to afford adequate
deterrence.

Beginning with the nature and circumstances of the
offense.  As we have heard today, Mr. Sarvestani was a manager
and part owner of a company called Innovative Technology
Systems, or ITS.  And he was a part owner of something called
Skylinks, FCZ.  These companies are based in the United States
Arab Emirates.  They procured goods in the United States and
elsewhere, and sold these goods to companies in Iran.

Because there is a trade embargo in place that
prohibits the sale of most U.S. made goods to Iran, the U.S.
made equipment at issue here was shipped through intermediary
destinations such as Dubai, Malasia, Hong Kong, and elsewhere,
in order to obscure the goods' true destination.  The
defendant's companies did millions of dollars of transactions
with Iranian companies over many years.  And a percentage, not
insignificant percentage, of that business involved the sale of
US-made products, including electronic equipment and including,
specifically, the satellite-related equipment at issue here.

The defendant is a highly sophisticated international
businessman.  Indeed, his counsel has pointed out this morning
one of the defendant's companies had as much as $200 million in
revenue in 2011, alone.  There is also no doubt that the

defendant was well aware of the laws prohibiting the sale of U.S. made goods to Iran. Indeed, in 2009, one U.S. supplier explicitly warned the defendant, in writing, to ensure that he complied with all U.S. export controls.

Instead, the defendant instructed his employees to disguise the fact that his employees were selling this merchandise to Iran. He warned his employees to be careful in relaying inquiries about the merchandise from the Iranian buyers to the U.S. suppliers. They were told to, quote "be very careful about this subject" unquote, to address the queries by telephone, and to never use e-mail.

As a result of the defendant's conduct, his employees lied to U.S. customs inspectors as to the ultimate destination of merchandise.

There is also evidence that the defendant was kept apprised of the progress of the illegal shipments, and that he monitored the illegal shipments.

The defendant's conduct took place over a number of many years. Why the defendant engaged in this conduct, that he knew to be illegal, is largely a mystery. He is a millionaire many times over. And these transactions, as defense counsel has pointed out today, resulted in either no profit or very little profit.

The defendant argues that he only sold satellite communications for the general population of Iran to use to

1    connect to the internet.

2           However, as the government has pointed out, some of

3    the equipment at issue here has a role in monitoring,

4    positioning, and controlling satellites and satellite antennas.

5    In any event, the new regulation that the defense has cited to

6    me was, concededly, not in effect during the many years that

7    equipment was shipped, by the defendant, to Iran.

8           And, accordingly, I cannot place reliance on the fact

9    that, recently, a regulation has come into effect which permits

10   the export of certain electronic equipment to Iran.

11          I conclude that the defendant engaged in extremely

12   serious criminal conduct.  The trade embargo against Iran

13   reflects the fact that it is a nation that actively supports

14   terrorism.  The trade embargo has been a critical element in

15   the international community's efforts to pressure Iran to end

16   its support of terrorism.

17          Here, this defendant knowingly and intentionally chose

18   to violate U.S. law designed to enforce the trade embargo.  He

19   took steps to actively conceal that violation and to mislead

20   U.S. customs inspectors.  The reasons for the defendant's

21   actions are not clear, and appear not to be financial in

22   nature, given the paltry amount of profit, particularly when

23   compared to the scope of his international commercial

24   enterprises.

25          With respect to the defendants's personal history and

characteristics.  He is 46 years old and grew up in Turan.  He
has a bachelors degree from an Iranian university and an MBA
from the University of Liverpool.  He created a successful IT
company in Iran.

And in 2000, the defendant sold his interests in the
IT company and he and his wife relocated to Dubai.

In Dubai, the defendant successfully pursued a number
of businesses.  He formed ITS, which was originally an IT
company.  The company later evolved into a general trading
company that did transactions in commodities such as steel and
edible oils.

The defendant later started a food distribution
company and a chain of pizza restaurants.  He later set up
Skylinks, with a $1.5 million dollar investment.

In 2012, the defendant and his family moved to
Singapore.  There, he started a company that builds residential
accommodations for workers on off-shore oil platforms.

The defendant has no criminal record.  And he has
already been incarcerated for approximately 10 months.

As we have discussed this morning, the defendant has
argued that further incarceration will jeopardize his and his
family's ability to maintain residency in Singapore, and to
obtain residency in Canada.

As I have said, while I'm very sympathetic to the
immigration issues faced by the defendant and his family, they

are not, in my judgment, factors that should be determinative
or dispositive of his sentence.

As I have said, every day in this courthouse
defendants plead guilty to offenses that will have immigration
consequences; generally, deportation from the United States to
whatever country it is they are a citizen of. And, in many
instances, the countries they are a citizen from are not
desirable countries in which to live. In many instances, the
defendants and their families have been residents in the United
States for decades. Accordingly, deportation has a devastating
effect on the defendant and on the defendant's family.

While it is tragic in every case, as I have said,
there is nothing novel about that consequence of engaging in
criminal conduct.

The guidelines recommend a sentence of 57 to 60 months
imprisonment. The probation department has recommended a
sentence of time served, which would be about 10 months. The
defense seeks a sentence of time served, and has suggested a
$25,000 fine.

The government asks for a guidelines sentence.

With all of these facts and considerations in mind,
I'll now describe the sentence I intend to impose, and then
I'll ask the parties if there is anything further they wish to
say.

With respect to imprisonment, I intend to grant a

variance from the applicable guidelines range.  I will grant a

variance in large part based on the case law defense counsel

has submitted, setting forth typical sentences in cases

involving export violations.  Many of the cases cited by the

defense involved equipment that could be used for military use.

The sentences imposed in these cases were,

nonetheless, shorter than the guidelines range applicable here.

Now, I do tend to agree with the government's point that it is

difficult to apply all of the cases that are cited by the

defense, because we don't know all of the relevant

circumstances.  We don't know what the role in the offense was

of the particular individual, we don't know where in the

hierarchy they stood, we don't even know whether they

cooperated and received a 5K letter from the government.

So there is any number of possible explanations as to

why the sentences are what they are.

But there are enough cases cited to me to make me

believe that I should give him weight in determining whether a

variance is appropriate here.

Now, having said that, intentional criminal conduct of

this sort, committed by a highly sophisticated businessman,

cannot be condoned.  The sentence imposed must be sufficient to

serve the objective of general deterrence.  The message cannot

go out that the U.S. trade embargo against Iran can be violated

without fear of serious consequences.

1          Under all of these circumstances, I intend to impose a

2     sentence of 30 months imprisonment.

3          I do not intend to impose a term of supervised

4     release, because I expect the defendant will be deported after

5     his term of incarceration is completed.

6          The guidelines recommend a fine of between $10,000 and

7     $100,000.  In light of the defendant's financial assets, I

8     intend to impose a fine of $100,000, which will be due

9     immediately.

10          I intend to impose a 100-dollar special assessment.

11          With respect to forfeiture I have entered a consent

12     preliminary order of forfeiture.

13          Is the government seeking any order with respect to

14     forfeiture?

15          MS. KOVNER:  No, your Honor.

16          THE COURT:  Mr. Coffield, is there anything further

17     you wish to say?

18          MR. COFFIELD:  I simply state for the record, your

19     Honor, the chart we gave you noted who cooperated and who did

20     not cooperate.  And, again, I would point to the xxx the Ark

21     case that closely tracked this, in that you had an owner who

22     was -- an owner who was exporting to Iran and to Cuba, was a

23     U.S. citizen, had circumstances more egregious than this,

24     obstructed justice, and was sentenced to 30 days incarceration,

25     and 6 months home confinement and I will respectfully request

1    that the Court reconsider its sentence.

2         THE COURT:  Well you have said that your chart

3    indicates who cooperated, and who did not.  I don't know how

4    you can possibly know that.  Are you referring to the fact that

5    some of the cases are sealed, and some are not; is that what

6    you are referencing?

7         MR. COFFIELD:  Yes, your Honor.  There are some cases

8    that are sealed.  We assume that the cases that were sealed

9    were cooperators.  And we also assume, we also note from some

10   of the records that were filed, that there were 5K motions, and

11   Rule 35 motions, so we took all of that into consideration,

12   your Honor.

13        THE COURT:  Well, as I have said, you may be right

14   that the sealed cases are cooperators, that I suppose that is

15   possible.  The point is, that we don't have enough facts to

16   derive more from these cases than I have.  And I will tell you

17   that, but for your submission indicating the types of sentences

18   that have been imposed in the past, I would likely have not

19   granted the variance that I did.

20        So I have given the cases that you have cited to me as

21   much weight as I feel I possibly can, given that we just don't

22   know all of the circumstances in each of those cases.  And when

23   it comes to sentencing, those facts matter.  It matters where

24   in the hierarchy a defendant was; it matters the nature of the

25   equipment that was involved; everything matters.  And while you

have given me some new information about the cases, I don't
have the breadth of information about these cases that I get
when I sentence a defendant in one of my own cases. And so I
have given as much weight to the case law you have cited to me
as I can, given that I don't know all of the facts set forth in
those cases.

At the end of the day, what we have is someone who was
highly sophisticated, was warned of the law -- in writing --
and for reasons that we don't know, chose to disregard it.

I have no doubt that this experience is likely
sufficient to deter Mr. Sarvestani from future violations of
the law. But, I have to be aware of my responsibility to
communicate to others who may be now violating the law, or who
may be considering violating the law, that they will receive
serious consequences if their violation of the law is detected.

In my judgement a sentence of 10 months is not
sufficient to serve the objective of general deterrence, and
that is why I have decided that a longer sentence is necessary.

Mr. Sarvestani, anything further you wish to say?

THE DEFENDANT: No. No, sir.

THE COURT: Ms. Kovner, anything else from the
government --

I'm sorry, Mr. Coffield, did you have something?

MR. COFFIELD: If the Court could make a
recommendation for FCI Petersburg, Virginia, your Honor.

1           THE COURT:  All right.

2           Ms. Kovner, anything else from the government?

3           MS. KOVNER:  No, your Honor.

4           THE COURT:  Mr. Sarvestani, for the reasons I just

5    stated, it is the judgment of this Court that you be sentenced

6    to 30 months imprisonment, ordered to pay a fine of hundred

7    thousand dollars, special assessment in the amount of $100.

8           I do recommend to the Bureau of Prisons that you be

9    incarcerated at the facility in Petersburg.

10          I am required to advise you of your appeal rights.

11          You can appeal your conviction if you believe that

12   your guilty plea was unlawful or involuntary, or if there was

13   some other fundamental defect in the proceedings that was not

14   waived by your guilty plea.

15          You also have a statutory right to appeal your

16   sentence under certain circumstances.  With few exceptions, any

17   notice of appeal must be filed within 14 days of judgment being

18   entered in your case.

19          Judgment will like likely be entered tomorrow.  Your

20   attorneys will discuss, with you, whether or not you wish to

21   file a notice of appeal.  If you are not able to pay the costs

22   of an appeal, you may apply for leave to appeal in forma

23   pauperis.

24          If you request, the clerk of the Court will prepare

25   and file a notice of appeal on your behalf.

1          Is there anything further?

2          MS. KOVNER:  Not from the government, your Honor.

3          MR. COFFIELD:  No, your Honor.

4          THE COURT:  All right.

5          We'll take a brief adjournment.

6          (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25